**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TAMMY LAVONNE REED,**

      **Plaintiff,**

**v.**                                                    **Case No.: 1:17-cv-02299**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 13, 17).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's

1

request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On January 14, 2013, Plaintiff Tammy Lavonne Reed ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of March 15, 2012 due to "coronary heart disease, diabetes, hypertension, depression, anxiety, arthritis, high cholesterol, and degenerative disc disease." (Tr. at 356-66, 390). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 202-11, 214-19). Claimant filed a request for an administrative hearing, which was held on November 17, 2015 before the Honorable Steven A. DeMonbreum, Administrative Law Judge ("ALJ"). (Tr. at 56-124). By written decision dated December 28, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 19-55). The ALJ's decision became the final decision of the Commissioner on February 10, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 12, 13). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 17). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 46 years old at the time of her alleged onset of disability and 50 years

old at the time of the ALJ's decision. She has a college undergraduate degree in psychology and she communicates in English. (Tr. at 61, 389). Claimant previously worked as bookkeeper, telephone customer service representative, Headstart teacher's aide, social services aide, and skill program training coordinator. (Tr. at 114-15).

III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

3

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of

"none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 24, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date, March 15, 2012. (Tr. at 25, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "coronary artery disease (CAD) status post-

stenting, chronic obstructive pulmonary disease (COPD), stage 3 chronic kidney disease (CKD), diabetes mellitus, bilateral carpal tunnel syndrome (CTS) status-post surgery, Hebron's nodes in the hands, osteoarthritis, degenerative disc disease with chronic cervical and lumbar strains, and obesity." (Tr. at 25, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 27, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift or carry, including upward pulling, 20 pounds occasionally and 10 pounds frequently; stand or walk, with normal breaks, for a total of about six hours in an eight-hour workday. The claimant can continuously operate foot controls; occasionally reach overhead bilaterally; frequently reach in other directions, handle, finger, feel, push, or pull with the bilateral upper extremities; occasionally climb ramps or stairs; never crawl or climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, or crouch. The claimant can have no more than occasional exposure to temperature extremes, dust, odors, fumes, gases, or vibrations. She can have no exposure whatsoever to hazards like dangerous moving machinery and unprotected heights.

(Tr. at 29, Finding No. 5). At the fourth step, with the assistance of a vocational expert ("VE"), the ALJ determined that Claimant was able to perform past relevant work as a bookkeeper, telephone representative, and skill training program coordinator. (Tr. at 46, Finding No. 6). In addition, considering Claimant's age, education, work experience, and RFC, the ALJ determined with the VE's assistance that Claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy such as a cashier, gate guard, or rental clerk. (Tr. at 48). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 48, Finding No. 7).

**IV.     Claimant's Challenge to the Commissioner's Decision**

Claimant raises four challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred in not recognizing her depression and anxiety as severe impairments. (ECF No. 13 at 23-26). In her second challenge, Claimant contends that the ALJ's decision does not properly consider her obesity.  (*Id.* at 27). Third, Claimant argues that the ALJ's credibility determination was deficient because the ALJ analyzed her RFC before evaluating her credibility and provided improper bases to discount her allegations. (*Id.* at 27-29).   Finally, Claimant asserts that the ALJ erred in assigning only "some weight" to the opinion of a consultative examiner. (*Id.* at 30-32).

In response to Claimant's challenges, the Commissioner argues that substantial evidence supported the ALJ's finding that Claimant's mental impairments were non-severe and the ALJ properly considered Claimant's obesity, evaluated her credibility, and explained why the consultative opinion was entitled to only some weight. (ECF No. 17 at 7-20).

**V.     Relevant Evidence**

The undersigned has considered all of the evidence of record, including documentation of medical examinations, treatment, evaluations, and statements. The information most relevant to Claimant's challenges is summarized as follows.

### A. Treatment Records

On October 17, 2011, Claimant presented to Florencio Neri, M.D., at Prime Care 12, Inc. (Tr. at 718). Claimant reported having severe depression over the past two months after she ran out of Cymbalta. (*Id.*). She was stressed by her brother's recent death. (*Id.*). Claimant reported fatigue, dizziness, and headaches; she believed the depression was causing her headaches. (*Id.*). She was noted to be 5 feet 9 inches tall and weighed 219

pounds. (Tr. at 720). Her body mass index was 32.3, her blood pressure ranged between 175/94 and 185/102 when measured at that visit, and her resting heart rate was within the normal range at 81 beats per minute. (*Id.*). Claimant smoked one pack of tobacco products per day. (Tr. at 719). Her current medications included Benadryl; Toprol, a beta-blocker used to treat cardiac issues; the antidepressant Cymbalta; Metformin, a medication used to treat type 2 diabetes; and the blood pressure medication Benicar. (Tr. at 720). Claimant stated that she had been tracking her blood pressure and it had "been okay" and she was tolerating her medications well without side effects. (Tr. at 718). Her respiratory and cardiovascular examinations were normal; she had normal range of motion, strength, and tone on her musculoskeletal examination; she had no neurological issues, including intact motor and sensory function, reflexes, gait, and coordination; and she was in no apparent distress with appropriate affect and demeanor, normal speech pattern, and grossly normal memory. (Tr. at 720). Claimant's Cymbalta was refilled and she was advised to avoid caffeine, reduce stress, and follow up in three months. (Tr. at 721). For hypertension, Claimant was to continue monitoring her blood pressure at home, exercise, reduce her salt intake, and lose weight. (*Id.*). For hyperlipidemia, Claimant was likewise advised to exercise and lose weight, as well as follow a low cholesterol/low fat diet. (*Id.*).

On December 4, 2011, Claimant was admitted to the Intensive Care Unit at Princeton Community Hospital due to a "hypertensive crisis" in which her blood pressure was 243/169 and she was in acute respiratory failure. (Tr. at 641). Her symptoms were initially believed to be caused by flash pulmonary edema, but testing showed that she was negative for the condition and it was determined that she was likely suffering from a cardiac issue. (*Id.*). Claimant was transferred to Roanoke Memorial Hospital on

December 6, 2011 and underwent a heart catheterization the following day. (Tr. at 468). Claimant had high grade stenosis in the first diagonal branch of her heart in which a cardiac surgeon performed percutaneous coronary intervention to place a drug eluting stent. (*Id.*). Claimant also had some moderate stenosis in her left anterior descending ("LAD") artery, but there was a low likelihood of physiological significance and medical intervention was deferred. (Tr. at 561-62). Claimant tolerated the heart catheterization well and had "no complaints" at the time of discharge on December 8, 2011. (Tr. at 468).

On January 9, 2012, Claimant followed up with Dr. Neri. She reported fatigue and seasonal allergies, but denied chest pain or palpitations; edema; shortness of breath; back, muscle, or joint pain; dizziness; headaches; weakness; endocrine issues; depression; anxiety; or sleep disturbances. (Tr. at 722). It was noted that Claimant was divorced with two children, she enjoyed reading, and her primary form of exercise was walking. (Tr. at 723). Claimant continued to smoke one pack of cigarettes per day. (*Id.*). Her weight was 220 pounds with a body mass index of 32.5, her heart rate was 91, and her blood pressure was 146/89 when measured in her left arm and 152/90 as measured in her right arm. (Tr. at 724). Claimant's physical examination was again normal, corresponding with the same results of her October 2011 visit. (*Id.*); *see* (Tr. at 720). No changes were made to Claimant's medication regimen. (Tr. at 724). Regarding Claimant's type 2 diabetes, Claimant was advised to lower her blood pressure, monitor her glucose levels, adhere to a 1,200 calories diabetic diet, lose weight, and exercise 30 minutes daily. (Tr. at 725). For hypertension, Claimant was to reduce her dietary salt intake, monitor her blood pressure, and exercise and lose weight. (*Id.*). For hyperlipidemia, Claimant was advised to quit smoking, follow a low cholesterol/low fat diet, and lose weight. (*Id.*). For her coronary artery disease, in addition to the prior recommendations, Claimant was to

9

continue her medications and take a daily aspirin. (*Id.*).

On January 19, 2012, Claimant followed up with cardiologist, Shahid R. Rana, M.D., following her heart catheterization and stenting procedure. Claimant stated that her breathing was "ok" and she had occasional "twinge like" chest pains, but she denied shortness of breath, chest palpitations, dizziness, weakness, numbness, fever, or chills. (Tr. at 714). She was currently taking high blood pressure medications, insulin, Lipitor to treat high cholesterol, a diuretic, Cymbalta, aspirin, Effient, and nitroglycerin. (*Id.*). Claimant's blood pressure was 130/68, and her heart rate was 68. (*Id.*). Her physical examination was normal, including her cardiac and pulmonary systems, and she had no edema in her extremities. (*Id.*). The assessment was coronary artery disease status post stent of her diagonal branch of the LAD artery, hyperlipidemia, hypertension, and Type 2 diabetes mellitus. (*Id.*). The plan was for Claimant to continue her current medications, quit smoking, and return for follow up in one month. (*Id.*).

On January 24, 2012, Claimant reported to Dr. Neri that she had fatigue, dizziness, back and joint pain, headaches, easy bruising, anxiety, and depression, but she denied shortness of breath. (Tr. at 726). Claimant's weight was 225 pounds and her blood pressure was 151/75 in her left arm and 134/58 in her right arm. (Tr. at 728). Her dosage of insulin was increased to treat her Type 2 diabetes, she was to continue taking Novolog before each meal and Metformin HCl twice daily, continue her hyperlipidemia regimen, and take vitamin D capsules. (Tr. at 729).

On February 7, 2012, Claimant presented to endocrinologist James R. Mulinda, M.D., for follow up after her hospitalization for acute coronary syndrome. (Tr. at 699). Dr. Mulinda noted that Claimant was diagnosed with Type 2 diabetes two years earlier and it was managed with medication until she began taking insulin in late 2011. (*Id.*). Her

glucose levels remained elevated in the upper 100-200 range. (*Id.*). On her review of systems, Claimant complained of joint pains, especially in her hips and shoulders; fatigue; weight gain; depressive anxiety; dizziness; and headaches. (*Id.*). However, Claimant denied chest pain or shortness of breath. (*Id.*). Claimant's blood pressure was 132/68, her lungs were clear, and she had normal cardiac rhythm. (*Id.*). For her diabetes, Claimant was encouraged to be more diligent with her glucose monitoring and take her medications appropriately; also, Claimant was advised regarding proper diet and exercise and Tradjenta was added to her medication regimen. (Tr. at 700). Her hypertension was controlled and she was to continue taking statins for her hyperlipidemia. (*Id.*). Claimant was noted to weigh 224 pounds and measured 5 feet 8 inches tall; she was advised to lose weight due to her obesity and Type 2 diabetes. (Tr. at 699-70).

On March 14, 2012, Claimant followed up with her cardiologist Dr. Rana. (Tr. at 717). Claimant stated that she had chest pain for an hour the previous day, but she took nitroglycerin and the pain resolved. (*Id.*). Claimant also had mild shortness of breath on exertion, continued to smoke, and had not taken medications for several days. (*Id.*). Dr. Rana strongly advised compliance with medications. (*Id.*). Claimant was prescribed Zocor in place of Lipitor and Plavix in place of Effient, but her medication regimen was otherwise unchanged. (*Id.*). She was advised to follow a heart healthy and low lipid diet and return for follow up in two months. (*Id.*).

On June 26, 2012, Claimant was transferred to Charleston Area Medical Center after presenting to Princeton Community Hospital with left facial numbness, blurred vision, and left shoulder and neck discomfort. (Tr. at 743). Claimant's stress test was normal and it was determined that Claimant had not suffered a transient ischemic attack or cerebrovascular accident ("stroke"), but her symptoms were instead caused by a Bell's

Palsy.[1] (*Id.*). She was prescribed a steroid treatment. (*Id.*).

On July 20, 2012, Claimant followed up with physician's assistant, Amy Goode, at the office of Jana Peter, D.O. (Tr. at 840). In addition to Bell's palsy, Claimant reported constant low back pain that radiated into her hips and lower extremities, as well as headaches. (*Id.*). Claimant's height was noted as 5 feet 8 inches; her weight was 246 pounds, her body mass index was 37.4; her blood pressure was 137/86; her pulse was 73 beats per minute; and the oxygen saturation in her blood was 95 percent. (Tr. at 841). Claimant's respiratory and cardiovascular examinations were normal. She had an asymmetrical smile with left facial drooping, but was neurovascularly intact in all extremities. (*Id.*). Claimant's Cymbalta was refilled and x-rays of her spine and hips were ordered. (Tr. at 841-42).

On August 6, 2012, Claimant followed up with Dr. Peters's physician's assistant, Matthew Dincher. (Tr. at 843). Claimant reported that her back pain was unchanged, noting that it first began in 2000 when she had her son. (*Id.*). The back pain continued to radiate into her hips and legs and she also experienced leg numbness, headaches, and burning and numbness in her left arm. (*Id.*). Claimant's weight was 247 pounds; her blood pressure was 160/84; her pulse was 101 beats per minutes; and her oxygen saturation was 97 percent. (Tr. at 844). Claimant denied chest pain, shortness of breath, dizziness, or weakness. (Tr. at 843). On examination, Claimant was in no apparent distress and was ambulating normally. (Tr. at 844). Her respiratory, cardiovascular, neurologic, and psychiatric examinations were normal. However, Claimant showed tenderness in her left

---

[1] "Bell's palsy is a form of temporary facial paralysis resulting from damage or trauma to the facial nerves." Bell's Palsy Fact Sheet, National Institute of Neurological Disorders and Stroke, available at https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Bells-Palsy-Fact-Sheet (last accessed March 8, 2018).

arm and her straight leg raising test was positive. (*Id.*). Claimant was referred to a neurologist. (*Id.*).

On September 19, 2012, Claimant saw Dr. Peters's physician's assistant, Melissa Hurst. (Tr. at 846). Claimant denied fatigue, chest pain, dizziness, shortness of breath, anxiety, depression, or sleep disturbances. (*Id.*). Claimant stated that her low back pain was unchanged and caused associated stiffness, numbness, and weakness in her legs. (*Id.*). Claimant's weight was still 247 pounds; her blood pressure was 135/83; her pulse was 74; and her oxygen saturation was 96 percent. (Tr. at 847). She was still in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, and psychiatric examinations. (*Id.*).

On October 3, 2012, Claimant saw Ms. Goode for a flu shot. (Tr. at 849). Claimant reported that she had a nerve conduction study on her left side and it was negative. (*Id.*). Claimant asked if she could have further evaluation of the issues in her left extremity, stating that her symptoms worsened after a car accident in December, which also precipitated left hip pain radiating into her left leg. (*Id.*). Claimant's weight was 249 pounds; her blood pressure was 148/93; her pulse was 84; and her oxygen saturation was 97 percent. (Tr. at 850). She was in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, neurologic, and psychiatric examinations, although Claimant complained of tenderness in her left hip and shoulder. (*Id.*). A MRI was ordered of Claimant's lumbar spine. Her Neurontin was refilled, and she was prescribed Trilipix. (Tr. at 850-51).

On November 7, 2012, Claimant followed up with Ms. Goode. (Tr. at 852). She reported that Neurontin helped her hip pain, but she still had significant pain during the day. (*Id.*). The pain was aggravated by weight-bearing, standing, and sitting. (*Id.*).

Claimant's MRI showed a possible left anterolateral annular disc tear at L2-L3. (*Id.*). Claimant's weight was 252 pounds; her blood pressure was 143/75; her pulse was 81 beats per minute; and her oxygen saturation was 96 percent. (Tr. at 853). Like her prior visit, Claimant was in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, neurologic, and psychiatric examinations, although Claimant complained of tenderness in her left hip and shoulder. (*Id.*). Claimant was referred to a neurosurgeon and her Neurontin was refilled. (*Id.*).

On December 7, 2012, Claimant again saw Ms. Goode. Claimant complained of pain all over, not just in her back, and stated that the pain was getting worse. (Tr. at 854). She indicated that Neurontin helped, but she still had significant pain. (*Id.*). Claimant's physical examination was the same as her prior visits in October and November. (Tr. at 855). She was referred to a rheumatologist and x-rays of her hips were ordered. (*Id.*).

On January 11, 2013, Claimant returned to Ms. Goode. (Tr. at 857). She reported a moderate degree of depression, stated that she was compliant with her Type 2 diabetes treatment, and was diagnosed with carpal tunnel syndrome in August 2012, although she had never seen an orthopedist. (*Id.*). Claimant weighed 256 pounds; her blood pressure was 148/92; her pulse was 83 beats per minute; and her oxygen saturation was 95 percent. (Tr. at 858). Like her prior visit, Claimant was in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, neurologic, and psychiatric examinations, although Claimant complained of tenderness in her left hip and shoulder. (*Id.*). Laboratory tests were ordered, Claimant was given a prescription for writs splints, and was referred to an orthopedist. (Tr. at 859).

On February 27, 2013, Claimant saw nurse practitioner, Robyn Adkins, at Dr. Peters's office. She reported a fall one week earlier and complained of joint pain in her left

14

knee. She denied chest pain, shortness of breath, dizziness, headaches, or weakness. (Tr. at 871). Her weight was 259 pounds; her blood pressure was 149/92; her pulse was 85 beats per minute; and her oxygen saturation was 96 percent. (Tr. at 872). Claimant did not appear to be in distress, was ambulating normally, and had normal respiratory and cardiovascular, examinations. (*Id.*). Claimant had pain in her left knee with flexion and extension and tenderness, but no laxity or subluxation of any joints, crepitus, or effusion. (*Id.*). The assessment was a sprain/strain of her left knee and leg. She was ordered to use a knee brace and an x-ray would be considered in one week if the pain did not resolve. (Tr. at 873).

On March 12, 2013, Claimant saw Ms. Goode to review laboratory results. Regarding her Type 2 diabetes, Claimant's compliance with treatment was poor. (Tr. at 874). She did not follow the proscribed diet and exercise regimen. (*Id.*). She did not have any complaints other than joint pain and denied fatigue, chest pain, edema, shortness of breath, or any other constitutional, cardiac, or respiratory issues. (*Id.*). Claimant's weight was 259 pounds; her blood pressure was 154/85; her pulse was 89 beats per minute; and her oxygen saturation was 95 percent. (Tr. at 875). Claimant was in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, neurologic, and psychiatric examinations. (*Id.*). Claimant complained of tenderness in her left hip and shoulder, chest, and upper arms, but she had no crepitus or effusion. (*Id.*). For her Type 2 diabetes, Claimant was advised to follow a strict diabetic diet and to bring in her glucose and food diaries for review. (*Id.*). A referral to an endocrinologist was considered. (*Id.*). Fish oil capsules were added to her treatment regimen for hypertriglyceridemia. Claimant was also referred to a rheumatologist regarding her diffuse arthralgia. (Tr. at 875-76).

On April 9, 2013, Claimant followed up with Ms. Goode. Claimant's compliance with her Type 2 diabetes treatment was better since her last visit. (Tr. at 877). She continued to have knee pain that began two months prior when she was walking up steps and her left knee gave out; since then, she could not put weight on it and had difficulty bending to dress herself. (*Id.*). She reported non-exertional chest pain, shortness of breath with mild exertion, and arthralgia. (*Id.*). Claimant's weight was 260 pounds; her blood pressure was 142/83; her pulse was 84 beats per minute; her oxygen saturation was 97 percent; and her glucose level was 146 mg/dl. (Tr. at 878). Like her prior visit, Claimant was in no apparent distress, ambulating normally, and had normal respiratory, cardiovascular, neurologic, and psychiatric examinations, although Claimant complained of tenderness in her left hip and shoulder, chest, and upper arms. (*Id.*). Claimant was referred to a cardiologist for her chest pain and x-rays were ordered of her left knee, which showed new joint effusion, but were otherwise normal. (Tr. at 879, 885). There was also no evidence of significant peripheral artery disease in Claimant's legs. (Tr. at 885). Claimant had not yet received an appointment with a rheumatologist pursuant to her previous referral. (Tr. at 879).

On April 17, 2013, Claimant followed up with Ms. Hurst at Dr. Peters's office. (Tr. at 880). Claimant stated that her blood glucose levels had been a "bit high" at home with average fasting readings in the 150-180 mg/dL range. (*Id.*). She denied having any chest pain or palpitations, edema, shortness of breath, anxiety, depression, sleep disturbances, or other issues in her review of systems. (*Id.*). Claimant's weight was 261 pounds. (Tr. at 881).

The following month, on May 6, 2013, Claimant saw cardiologist, Mohammad Javed Rana, M.D., at the referral of Dr. Peters for evaluation of chest pain. (Tr. at 897).

16

Claimant reported fatigue, headache, insomnia, dizziness, shortness of breath on exertion, pitting edema in her left leg, and nausea. (Tr. at 898). Claimant's respiratory and cardiovascular examinations were normal, but Claimant had left and right trace edema. (*Id.*). Dr. Rana ordered an EKG and pulmonary function testing. (*Id.*). Her HCTZ was switched to Lasix and Ranexa was prescribed. (Tr. at 899). Claimant was counseled regarding medication, diet, and exercise compliance. (*Id.*).

On May 22, 2013, Claimant followed up with Dr. Rana to review her test results. (Tr. at 901). Her echocardiogram was normal and her spirometry test ruled out significant abnormalities. (Tr. at 903). Claimant complained of chest pain/pressure and shortness of breath on exertion, but she no longer had fatigue, insomnia, dizziness, or nausea. (Tr. at 902). Claimant weighed 263 pounds. and her blood pressure was 142/69. (*Id.*). Her physical examination was normal, including no edema. (*Id.*). Dr. Rana opined that a recurrence of coronary ischemia might be responsible for Claimant's symptoms; he strongly suggested another heart catheterization and increased her dosage of Ranexa. (Tr. at 903). Claimant's hypertension and hyperlipidemia were controlled, and she was told to follow an aggressive diet and exercise therapy for her diabetes. (*Id.*).

On May 28, 2013, Dr. Rana performed a diagnostic heart catheterization on Claimant at Bluefield Regional Medical Center. (Tr. at 906, 914). Claimant's left main artery was normal, her LAD had mild 30 to 40 percent stenosis and mild diffuse distal disease, minimal to mild disease in the left circumflex coronary artery, and 50 to 70 percent stenosis in the mid segment of the right coronary artery. (Tr. at 907). A drug eluting stent was placed in Claimant's right coronary artery. (Tr. at 912). Claimant "did excellent" and started feeling much better within hours of surgery. (*Id.*). Her shortness of breath was improved and she had no more chest pain. (*Id.*). Claimant was discharged the

following day at which time her blood pressure was 154/76. She had normal cardiac rhythm, her lungs were clear, and she had no edema. (*Id.*).

On May 31, 2013, Claimant saw Frederick B. Morgan, D.O.'s physician's assistant, Gregory G. Southers, at the Orthopedic Center of the Virginias upon a referral from Dr. Peters. Claimant complained of left wrist pain, left hand paresthesia, and bilateral knee pain. (Tr. at 980). Claimant had some synovitis and carpal tunnel syndrome in her left wrist and +1 effusion in her right knee that was aspirated and a corticosteroid was injected. (Tr. at 981). Claimant was referred to physical therapy to work on her range of motion and strengthening. (*Id.*).

On June 10, 2013, Claimant followed up with Dr. Rana. (Tr. at 934). She complained of nausea and dizziness with headaches since starting the increased dosage of Ranexa and Lopressor. (*Id.*). Her chest pain and pressure was improved; it happened once per week and was lessening. (*Id.*). Her pedal edema in her left leg with thigh and hip pain and her weakness when walking was resolved. (*Id.*). Claimant stated that her shortness of breath when going up stairs or hills was increased in the last 5 months. (*Id.*). Her weight was 264 pounds, her pulse was regular at 77 beats per minute, and her blood pressure was 135/69. (Tr. at 935). Her physical examination was normal. (*Id.*). Given that Claimant was feeling much better since her procedure, with good symptom relief, she was to continue her medications, except that she could discontinue Ranexa as it was likely the source of her nausea. (Tr. at 936). Claimant was again instructed to modify her risk factors such as cease smoking, lose weight, control her diet, and exercise. (*Id.*).

On January 17, 2014, x-rays were taken of Claimant's lumbosacral spine to evaluate her complaints of back pain. (Tr. at 1056). When compared to her previous x-rays taken in July 2012, there was mild to moderate degenerative change, primarily in the lower

18

lumbar facets. (*Id.*). X-rays of her cervical spine to evaluate her neck pain showed loss of cervical lordosis, which was probably from muscle spasms, and minimal degenerative disc disease at C5-6. (Tr. at 1057).

On January 29, 2014, Claimant saw Jessica Sheets at Derm One for painful red lesions on her left radial palm, right thenar eminence, and right ankle. (Tr. at 1167). Claimant was assessed with granuloma annulare on her middle fingers for which topical steroids were prescribed; dermatofibroma on her left shin and right ankle which were benign, but could be surgically removed if they became symptomatic or grew; and rosacea on Claimant's face for which Claimant was prescribed a topical gel. (Tr. at 1167-68). It was noted that granuloma annulare was usually a self-limiting condition and, although rosacea was a chronic condition, it could be limited by reducing exposure to triggers or laser therapy. (*Id.*).

On February 5, 2014, Claimant presented as a new patient to Bluefield Gastroenterology, PLLC, due to her complaints of diarrhea and nausea with occasional vomiting for the last few months. (Tr. at 990). Her weight was 254 pounds and she stated that she lost 15 pounds since November. (Tr. at 990, 993). The plan was for Claimant to undergo a diagnostic EGD and colonoscopy pending clearance by her cardiologist. (Tr. at 994).

Shortly thereafter, on February 10, 2014, Claimant followed up with Mr. Southers regarding her right knee pain and left hand paresthesia. (Tr. at 983). The assessment was osteoarthritis in her right knee for which she was given a corticosteroid injection and Claimant wished to proceed with left carpal tunnel release surgery. (Tr. at 984).

On February 19, 2014, Claimant saw Dr. Rana for an eight month follow-up appointment and pre-operative clearance for carpal tunnel surgery. (Tr. at 976). Claimant

had chronic dull, aching chest pain that was worse with exertion and dyspnea on exertion, but she had no associated symptoms of her chest pain, her pedal edema was improved and her Bell's palsy was resolved with steroids. (Tr. at 976). Claimant's weight was 252 pounds, her pulse was 65 beats per minute, and her blood pressure was 155/74. (Tr. at 977). Her physical examination was normal. (Tr. at 977-78). Claimant continued to smoke. (Tr. at 978). Claimant's symptoms were atypical for angina and more likely musculoskeletal. (*Id.*). It was noted that Claimant's previous angina symptoms were resolved status post stenting. (*Id.*). Claimant's losartan and Lasix were switched to Tribenzor, and she was again advised regarding risk factor modification. (*Id.*). She was cleared for her EGD/colonoscopy and carpal tunnel surgery. (*Id.*).

On March 24, 2014, Claimant saw Dr. Morgan, stating that the previous knee injection provided temporary relief, but her knee pain returned. (Tr. at 985). Therefore, Dr. Morgan planned to take a MRI to rule out a torn meniscus. (Tr. at 986). Claimant was still scheduled to proceed with carpal tunnel release surgery. (*Id.*).

On April 29, 2014, Claimant had an EGD and colonoscopy due to her complaints of diarrhea, abdominal pain, heartburn, and nausea. (Tr. at 996-1000). Claimant had mild distal esophagitis, a small hiatal hernia, mild gastritis, mild sigmoid diverticulitis, and small grade 1 internal hemorrhoids. (Tr. at 996, 999). Claimant also had an abdominal ultrasound to evaluate her gastrointestinal complaints on May 6, 2014. (Tr. at 1001). It showed that Claimant had a mildly fatty and enlarged liver. (*Id.*).

On May 13, 2014, Claimant had left carpal tunnel release surgery. (Tr. at 987). She followed up with Mr. Southers on May 22, 2014 at which time she was overall doing well. Her left hand paresthesia was improved, she had full range of motion with flexion and extension in her fingers, and good strength when opposing her fingers. (Tr. at 989).

20

On May 15, 2014, Claimant saw Bandu Paudyal, M.D., at Bluefield Neurology regarding her generalized headache. Claimant stated that she had headaches for the past 13 years, but they were worse in the past year, occurring almost daily and were moderately severe with associated mild nausea and light sensitivity. (Tr. at 1297, 1301). Claimant weighed 253 pounds and her blood pressure was 132/76. (Tr. at 1300). Her heart, lung, and neurological examinations were normal, including normal motor strength in her extremities, normal sensation throughout, and normal reflexes. (Tr. at 1300-01). Claimant's metoprolol was switched to long-acting Inderal, and Claimant was advised to quit smoking. (Tr. at 1301).

On May 30, 2014, Claimant followed up with nurse practitioner, Melody Ponce, at Bluefield Gastroenterology, PLLC. Claimant had been taking Protonix and Zantac each night. (Tr. at 1003). Her nausea was about the same and she continued to have diarrhea, but her vomiting had improved to some extent. (*Id.*). She weighed 242 pounds and had lost an additional 12 pounds since her last visit because she could not eat very much. (Tr. at 1003, 1007). Claimant's diagnoses were acute gastritis, esophagitis, internal hemorrhoid, diverticulitis, diarrhea, GERD, abdominal pain, nausea/vomiting, abnormal weight loss, and clostridium difficile. (Tr. at 1007). Claimant was to continue taking Pantoprazole, Zantac, and Zofran, and was additionally prescribed Vancomycin. (*Id.*). On the same day, Claimant followed up with Dr. Morgan. She was doing "quite well" following her carpal tunnel release. (Tr. at 1083). However, she had right knee pain without swelling. (*Id.*).

On June 26, 2014, Claimant saw Kathleen Burge, APRN, at Bluewell Family Clinic. Claimant weighed 237 pounds; her blood pressure was 149/69; and her oxygen saturation was 95 percent. (Tr. at 1009, 1011). She appeared in mild distress, but was ambulating

normally and had a normal respiratory, cardiovascular, musculoskeletal, and neurologic examinations, including no shortness of breath, no edema, and her cardiac rhythm, motor strength and tone, movement in all extremities, gait and station, sensation, and reflexes were all normal. (Tr. at 1012-13).

On October 1, 2014, Claimant followed up with Ms. Sheets regarding her dermatological issues. Her granuloma annulare was improved and she was to continue applying the topical steroid cream. (Tr. at 1184). Her prescription topical gel for her rosacea was also renewed. (Tr. at 1185).

On October 20, 2014, Claimant saw nurse practitioner, April A. Christ, at Javed Cardiac Center, PLLC, with an onset of chest pain/pressure, shortness of breath, near syncope, and unexplained fatigue over the past two weeks. (Tr. at 1097). Claimant stated that she felt relief from her chest pain when she took sublingual nitroglycerin. (*Id.*). Claimant weighed 215 pounds and her blood pressure was 136/75. (Tr. at 1098). Ms. Christ opined that Claimant's symptoms were suspicious for ischemia and she suggested a stress test for evaluation. (Tr. at 1100). She advised Claimant that she could continue taking aspirin daily and sublingual nitroglycerin. (*Id.*).

On October 29, 2014, Claimant saw Rao Ali Hashim Khan, M.D., at Bluefield Nephrology. Based on Claimant's laboratory test, Dr. Khan assessed that Claimant had acute renal failure syndrome, which was possibly due to NSAID-induced toxicity. (Tr. at 1121, 1125). Claimant also had moderate stage 3 chronic kidney disease. (*Id.*). Claimant's medications were adjusted and further testing was ordered. (*Id.*).

On November 4, 2014, Claimant's stress test was positive for myocardial ischemia. (Tr. at 1104). Her ejection fraction was 63 percent. (*Id.*). However, Claimant's echocardiogram taken the following day showed no evidence of pericardial effusion,

normal global systolic function, slight concentric left ventricular hypertrophy, and no evidence of any significant valvular abnormality, atrial septal defect, or ventricular septal defect. (Tr. at 1102).

On November 21, 2014, Claimant had a cardiac catheterization due to her complaints of shortness of breath and chest pain. Her blood pressure was 136/68, her lungs were clear to auscultation, and her cardiac rhythm was normal. (Tr. at 1091). The cardiac catheterization revealed no new lesions that would benefit from percutaneous intervention. (Tr. at 1095). The recommendation was continued medical management of her mild nonobstructive coronary artery disease. (*Id.*).

On December 3, 2014, x-rays were taken of Claimant's kidneys to evaluate her kidney disease and diabetes. The results were a normal. (Tr. at 1388). The following month, on January 15, 2015, Claimant followed up with Dr. Rana. As far as her angina, Claimant was doing "very well." (Tr. at 1111, 1113). Her shortness of breath was stable and there was no evidence of heart failure. (*Id.*). Her current testing showed no significant coronary obstructive disease. (*Id.*). Dr. Rana concluded that Claimant's chest pains were atypical and musculoskeletal. He recommended that Claimant take Tylenol and apply a hot compress to the area. (*Id.*). She was to continue her antianginal therapy, use nitroglycerin as recommended, follow a high fiber diet, walk five times per week for 30 minutes at least, and lose weight. (*Id.*). Claimant's hypertension was mildly elevated per Claimant, but was benign. (*Id.*). Dr. Rana prescribed Norvasc and advised Claimant to monitor her blood pressure and watch for edema. (*Id.*). Dr. Rana also adjusted Claimant's medications for hyperlipidemia and advised that she quit smoking. (Tr. at 1113-14).

On January 21, 2015, Claimant saw Ms. Burge for a regular check-up and medication refills. She weighed 231 pounds; her blood pressure was 146/69; and her

oxygen saturation was 98 percent. (Tr. at 1156). Claimant continued to smoke, but had reduced her intake to one-fourth of a pack of cigarettes per day. (*Id.*). Claimant was ambulating normally. (Tr. at 1157). Her respiratory, psychiatric, cardiovascular, musculoskeletal, and neurologic examinations were normal, including no shortness of breath or edema and normal muscle strength and tone, range of motion in her extremities, gait and station, sensation, reflexes, and coordination. (Tr. at 1157-58). Claimant's diagnoses were acute renal failure syndrome, hypertension, type 2 diabetes mellitus without mention of complication, and lumbosacral spondylosis without myelopathy. (Tr. at 1158-59). Claimant was again treated with medication. (Tr. at 1159).

On January 22, 2015, Claimant followed up with Dr. Khan. She had no new complaints and denied any nausea, vomiting, diarrhea, chest pain, or shortness of breath. (Tr. at 1130, 1134). Claimant's chronic kidney disease was controlled and would be re-evaluated in six months. (Tr. at 1135). Her hypertension was also controlled, and she had no acute complaints regarding her coronary arteriosclerosis. (*Id.*).

On May 1, 2015, Claimant saw Dr. Rana. She reported chronic chest pain that she described as a "soreness and nagging" that was non-pleuritic in nature and did not have any associated symptoms. (Tr. at 1161). Claimant also reported swelling in her extremities and joint pain in her knees and shoulders. (*Id.*). She admitted that she did not watch her diet for the previous few months and gained 20 pounds, which coincided with her quitting smoking. (*Id.*). Claimant weighed 255 pounds and her blood pressure was 144/68. (Tr. at 1162). Her physical examination was normal other than some trace edema in her lower extremities. (Tr. at 1163). Her angina was stable. (Tr. at 1164). The chest pain was most likely costochondritis with other arthritis symptoms for which Claimant was to continue her current medical therapy. (*Id.*). Her chronic diastolic heart failure was also controlled

24

and stable with no evidence of congestion or central venous pressure elevation. (*Id.*). The mild elevation in Claimant's blood pressure and trace edema was due to Claimant's weight gain; she was instructed to go on a strict diet, lose weight, and exercise. (*Id.*). Claimant was also instructed to continue taking her medications for hyperlipidemia. (*Id.*).

On July 30, 2015, Claimant followed up with Dr. Khan. She weighed 260 pounds and her blood pressure was 121/58. (Tr. at 1220). Her physical examination was normal. (Tr. at 1220-21). Claimant's chronic kidney disease was stable and would be reevaluated in 6 months. She had no complaints relating to her coronary arteriosclerosis, and her blood pressure was controlled. (Tr. at 1221). Claimant's recent testing showed hyperglycemia blood sugars in excess of 400 mg/dL; Claimant was provided detailed counseling regarding the diet that she should follow, regular exercise, weight loss, and compliance with medications. (*Id.*).

On August 5, 2015, Claimant saw Chad Caskey at Derm One for dermatological follow up. For her granuloma annulare on her index fingers, her prescription for a topical steroid cream was renewed. (Tr. at 1293). For the rosacea on her cheeks, her prescription lotion was likewise refilled. (*Id.*). Claimant also had a neoplasm of uncertain behavior on her right forearm that was shaved from her skin for biopsy. (*Id.*). Claimant also had lentigo (benign pigmented lesions) on her left forearm and was counseled that the areas could be resolved with sunblock, sun avoidance, bleaching creams, retinoid, chemical peels, or laser. (Tr. at 1293-94). On the same date, Claimant followed up with Ms. Ponce, reporting some nausea, but no vomiting. (Tr. at 1344). Claimant had gained 50.8 pounds since her last visit and stated that since she was cured of clostridium difficile, her appetite returned and she now ate excessively. (*Id.*). Claimant weighed 268 pounds and her blood pressure was 118/64. (Tr. at 1347). Her physical examination was normal other than some

tenderness in her abdomen. (Tr. at 1347-48). Claimant was advised to continue pantoprazole, Zantac, start Zofran, avoid late night snacks, and minimize use of caffeine and soda products. (Tr. at 1348).

On September 9, 2015, Claimant saw Ms. Burge for a three month follow up appointment and medication review. (Tr. at 1337). Claimant ambulated with a cane at this appointment. (Tr. at 1342). Claimant was active, alert, fully oriented, and had good judgment and normal recent and remote memory, but her mood was depressed. (*Id.*). Her respiratory, cardiovascular, musculoskeletal, and neurologic examinations were normal. (*Id.*). Ms. Burge's assessment was unspecified anxiety, controlled hypertension, coronary arthrosclerosis, diabetes, granuloma annulare, malaise and fatigue, and obesity. (Tr. at 1343). Claimant was prescribed Novolog and hydrocodone-acetaminophen. (*Id.*).

On September 29, 2015, Claimant saw Dr. Paudyal for the first time since May 2014. (Tr. at 1423). Claimant complained of bilateral hand tingling and numbness of mild to moderate severity that was associated with dropping things and mild neck pain and radiation up to her left shoulder. (Tr. at 1427). Claimant stated that the symptoms were aggravated by holding things with her left hand and her left carpal tunnel release surgery did not relieve her symptoms. (*Id.*). Dr. Paudyal planned for Claimant to undergo a nerve conduction study to evaluate whether her symptoms were attributed to continued carpal tunnel syndrome or cervical radiculopathy. (*Id.*). Claimant also reported that she continued to have headaches for which she was prescribed riboflavin vitamin supplements. (*Id.*). Botox would be considered if her symptoms persisted. (*Id.*). Claimant was advised to avoid NSAIDs due to her nephropathy. (*Id.*). Claimant's heart and lung examinations were normal. (*Id.*). On her higher mental function examination, Claimant was alert, oriented, had normal language attention, and her registration and recall were

both 3 out of 3. (*Id.*). Claimant had full motor strength in her extremities and normal finger-to-nose and heel-to-shin tests, gait, and reflexes. (*Id.*). Her sensation was also normal other than reduced pin sensation in her right thumb. (*Id.*).

On October 9, 2015, Claimant had a clinical evaluation at Southern Highlands Community Mental Health Center by Tina R. Borich. Claimant stated that she battled with depression all of her life and her primary physician wanted her to come in for an evaluation, but she kept putting "it off." (Tr. at 1351). Claimant was taking Cymbalta, which helped. (*Id.*). The diagnoses were moderate major depressive disorder and generalized anxiety disorder. (Tr. at 1353). A psychiatric evaluation was recommended to evaluate pharmacological treatment. (Tr. at 1354).

On November 11, 2015, Claimant saw Dr. Paudyal. Claimant's blood pressure was 137/75. (Tr. at 1413, 1416). The results of her physical examination was the same as her visit two months earlier in September. (Tr. at 1416-17). Claimant's nerve conduction study revealed moderately severe bilateral carpal tunnel syndrome. (Tr. at 1417). She was advised to try wrist braces and if her symptoms persisted, a surgical referral would be considered. (*Id.*). For her headaches, Claimant was prescribed Topomax, advised to avoid NSAIDs, and referred for a sleep study to evaluate whether Claimant had sleep apnea.

### B. Evaluations and Opinions

On February 28, 2013, Curtis Withrow, M.D., assessed Claimant's physical RFC based upon a review of her records. Dr. Withrow opined that Claimant could perform light level work and stand, walk, and sit with normal breaks for 6 hours in an 8-hour work day. (Tr. at 158). She could occasionally climb ramps/stairs, balance, stoop, kneel, or crouch, but could never climb ladders/ropes/scaffolds or crawl. (*Id.*). Claimant should avoid concentrated exposure to extreme temperatures, vibration, and fumes and avoid even

moderate exposure to hazards. (Tr. at 159). Dr. Withrow explained that the assessed limitations resulted from Claimant's significant cardiovascular disease, involving elevated blood pressure and coronary artery disease with stenting, and her allegations of painful range of motion in her neck, lower back, and hips; however, her radiological evidence showed only mild degenerative disease in her cervical and lumbosacral spine and she was neurologically intact. (Tr. at 159). Rabah Boukhemis, M.D., affirmed Dr. Withrow's RFC assessment on October 11, 2013. (Tr. at 182).

On February 28, 2013, Jim Capage, Ph.D., evaluated Claimant's mental impairments. Dr. Capage assessed that Claimant had a secondary diagnosis of non-severe affective disorders. (Tr. at 156). The evidence was insufficient to rate whether Claimant had restrictions in activities of daily living; social functioning; maintaining concentration, persistence, or pace; or repeated episodes of decompensation of extended duration. (Tr. at 156-57).

Thereafter, on August 27, 2013, Claimant had a psychological examination performed by Tonya McFadden, Ph.D., for the West Virginia Disability Determination Service. Claimant reported that she resided with her 12-year-old son and drove herself to the appointment. (Tr. at 938). Claimant revealed that she was charged with making false loans when she worked as an assistant to the vice president of a bank, but was not convicted. (Tr. at 941). Claimant's social functioning appeared within normal limits during the evaluation, and she indicated that she went to the grocery store twice per month and visited with a friend once per month. (Tr. at 942). Her daily activities included taking her son to the bus stop, watching television, preparing simple meals, occasionally washing dishes, doing laundry, straightening the house, sitting on the porch, reading, running errands as needed, and occasionally using the computer and playing games on

her phone. (*Id.*). Dr. McFadden's diagnoses were dysthymic disorder and a provisional diagnosis of major depressive disorder. (*Id.*). Claimant's recent memory was moderately deficient and her concentration was mildly deficient on that examination. (Tr. at 943).

On September 19, 2013, Kip Beard, M.D., conducted an internal medicine examination for the West Virginia Disability Determination Service. Claimant presented with a cane and was mildly limping on the left, but her gait was not unsteady or unpredictable. (Tr. at 945, 947). Claimant could stand unassisted, rise from a seat, and step up and down from the examination table without obvious difficulty. (Tr. at 948). Dr. Beard stated that he did not see any obvious need for the cane, as Claimant was able to ambulate without it. (*Id.*). Claimant appeared comfortable when seated, but uncomfortable when supine. (*Id.*). Claimant weighed 260 pounds and her blood pressure was 120/74. (*Id.*). Regarding Claimant's diabetes and hypertension, Claimant had some sensory abnormalities suggesting early neuropathy. (Tr. at 950). However, Claimant's gait was not neuropathic, and she had no retinopathy changes or indications of renal failure. (*Id.*). Her coronary artery disease status post stenting was stable and her chest discomfort and shortness of breath were consistent with that condition. (*Id.*). Claimant had some range of motion abnormalities in her back and neck without neurologic compromise and some osteoarthritis in her joints with mild motion abnormalities and no inflammatory arthritis. (*Id.*). Claimant had mildly reduced grip strength of 4/5 in both hands, but her manipulation was preserved. (*Id.*). Finally, Claimant had mild pulmonary function restriction. (*Id.*).

On September 24, 2013, Joseph A. Shaver, Ed.D., evaluated Claimant's mental impairments upon reconsideration of her claims for benefits. Dr. Shaver reviewed Claimant's updated records, including her recent August 2013 mental status examination,

and concluded that Claimant had only mild restriction in activities of daily living; social functioning; and maintaining concentration, persistence, or pace. (Tr. at 179). There was insufficient evidence to determine whether she had repeated episodes of decompensation of extended duration. (*Id.*). Dr. Shaver noted that Claimant had no issues getting along with others and prepared meals, cleaned her house, did laundry, drove, shopped, and handled her personal finances. (Tr. at 180). Dr. Shaver opined that Claimant possessed the mental capacity to engage in gainful work-like activity on a sustained basis. (*Id.*).

On September 24, 2015, Claimant had another internal medicine examination for the West Virginia Disability Determination Service, which was performed by Stephen Nutter, M.D. (Tr. at 1321). Claimant weighed 269 pounds and her blood pressure was 172/84. (Tr. at 1323). Claimant ambulated with a somewhat limping gate and her right leg was somewhat stiff, but her gait was not lurching, unsteady, or unpredictable. (Tr. at 1324). Claimant had a cane with her, but did not really use it. (*Id.*). She was "kind of carrying" the cane. (*Id.*). Claimant was stable at station and comfortable in the supine and sitting positions. (*Id.*). Her intellectual functioning, hearing, understanding, and recent and remote memory appeared normal. (*Id.*). Dr. Nutter's impression was that Claimant had coronary artery disease and chest pain, hypertension, diabetes, chronic cervical and lumbar strain with degenerative disc disease, and osteoarthritis. (Tr. at 1326). Dr. Nutter opined that Claimant's chest pain could be anginal unless proven otherwise, but she had no evidence of congestive heart failure and no definite end-organ damage from her diabetes or hypertension. (*Id.*). Claimant exhibited pain and tenderness to palpation in her cervical spine. She could forward bend to 45 degrees, extend to 40 degrees, lateral bend to 25 degrees on the right and 20 degrees on the left, and rotate to 50 degrees on the right and 45 degrees on the left. (Tr. at 1325). In her dorsolumbar spine, Claimant also

showed tenderness, but her straight leg raising test was negative. (*Id.*). Claimant could stand on one leg at a time, but had some difficulty balancing on her right leg. (*Id.*). She could bend forward to 40 degrees and lateral bend to 15 degrees on the right and 10 degrees on the left. (*Id.*). Claimant's sensation was intact except for loss of pinprick and light touch to the lateral aspect of her right thigh only. (*Id.*). Claimant showed no definite evidence of radiculopathy, but the above sensory abnormality could possibly be related to an issue in her back. (Tr. at 1326). Claimant had pain and tenderness in her shoulders, elbows, hands, knees, and right hip. (*Id.*). She had reduced range of motion in her joints, Heberden's nodes in both hands, and positive Tinel's test at both wrists, possibly caused by carpal tunnel syndrome. (*Id.*). Claimant had no evidence of rheumatoid arthritis. (*Id.*).

Dr. Nutter completed a medical source statement of ability to do work-related activities form. He opined that Claimant could occasionally lift or carry up to 20 pounds, but never lift or carry over 20 pounds. (Tr. at 1328). Dr. Nutter found that Claimant could sit for 4 hours in a work day, but only for 3 hours at a time without interruption; stand or walk for 2 hours total, but only stand for 1 hour and sit for 30 minutes at a time without interruption. (Tr. at 1329). Dr. Nutter stated that Claimant did not need a cane to ambulate. (*Id.*). Claimant could occasionally reach overhead or push/pull and frequently reach in other directions, handle, finger, and feel with her hands. (Tr. at 1330). Claimant could continuously operate foot controls with her feet. (*Id.*). Claimant could occasionally climbs stairs and ramps or stoop, but could never climb ladders or scaffolds, balance, kneel, crouch, or crawl. (Tr. at 1331). Dr. Nutter did not state what medical or clinical findings supported the assessed postural limitations. (*Id.*). Finally, Claimant could occasionally tolerate moving machinery, operate a motor vehicle, and be exposed to vibration, but could never work at unprotected heights. (Tr. at 1332).

### C. Claimant's Statements

During her November 2015 administrative hearing, Claimant stated that she was 5 feet 10 inches tall, weighed 263 pounds, and had quit smoking in January 2015. (Tr. at 77, 88). She testified that she could not work, because she could not remember things or function well cognitively, use a computer due to carpal tunnel syndrome, or sit for too long due to issues with her back and left leg. (Tr. at 110). As far as her medical history, Claimant explained that she had a good result from stenting for her coronary artery disease, but then began having chest pains on exertion. (Tr. at 75-76). Her cardiologist prescribed Nitrostat, which successfully alleviated the pain within moments, and she used it two or three times per week. (Tr. at 77, 79). She acknowledged that both her cardiologist and endocrinologist told her to exercise and control her diet. (Tr. at 77-78). Claimant testified that she also had carpal tunnel syndrome in her left wrist for which she had surgery in May 2014. (Tr. at 79-80). Claimant stated that she initially had good results from the surgery, but in the past six months she could not hold things with her left hand. (Tr. at 80). She also had issues with her right hand, but they were less severe. (*Id.*). Her granuloma annulare also interfered with using her hands because it caused too much pain to grip things, type, or use a pen. (Tr. at 81-82).

As to her other conditions, Claimant testified that she suffered from gestational diabetes fourteen years prior, but it evened out after her pregnancy. (Tr. at 84). She again began having issued with her blood sugar levels in 2012. (Tr. at 85). Claimant noted that she was treated by registered nurse, Ms. Burgh, for her diabetes because she had issues finding another provider or specialist that would take Medicaid. (Tr. at 86-87). She stated that her diabetes was often uncontrolled and caused her to feel fatigued, thirsty, and suddenly fall asleep. (Tr. at 86-87, 89). Claimant testified that she also had left hip pain

32

dating back 25 years, edema in her knees, and numbness in her feet. (Tr. at 92, 94). She conceded that her stage 3 kidney disease was stable. (Tr. at 95-96). Claimant testified that she always had depression and anxiety, but the conditions worsened since she became aware of her heart condition. (Tr. at 96, 100). As far as daily activities, Claimant could vacuum, load the dishwasher, assist with cooking, shop for groceries, and do laundry, but had to take breaks when cleaning the apartment. (Tr. at 101-04). In addition to household activities, she spent her time reading, napping, or visiting with her neighbor, although she sometimes did nothing but watch television. (Tr. at 101, 104). She sometimes used a motorized cart at the grocery store and used a cane to navigate hills or steps. (Tr. at 103-04). Claimant acknowledged that she could drive. (Tr. at 106). She estimated that she could sit for two or three hours, stand for two hours, and walk for one hour total in a work day. (Tr. at 108-09). The ALJ remarked during the hearing that he observed Claimant walk into the hearing with the cane in her left hand despite the fact that she was wearing a wrist splint and claimed to have carpel tunnel syndrome that was so severe in her left hand that she could not grip things. (Tr. at 113). Claimant replied that "to [her] knowledge," she thought she had the cane over her wrist and was not actually using it at the time. (*Id.*).

## VI.    **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to

justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. Step Two Finding

In her first challenge to the Commissioner's decision, Claimant argues that the "ALJ erred in not recognizing [her] depression and anxiety as a severe impairment." (ECF No. 13 at 23) (internal markings omitted). At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1522(a), 416.922(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include, *inter alia*, lifting, pushing, pulling, reaching, carrying, and

handling. 20 C.F.R. §§ 404.1522(b), 416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003).

The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In this case, the ALJ found that Claimant suffered from numerous severe impairments. (Tr. at 25). Accordingly, the sequential process proceeded to step three. From that perspective, even if the ALJ erred by not considering Claimant's mental impairments to be severe, Claimant suffered no harm because the outcome at step two was the same: her applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step

35

of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W. Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W. Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W. Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545

n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

In addition to a lack of prejudice to Claimant flowing from the ALJ's step two findings, Claimant's challenge is unpersuasive in light of substantial evidence supporting the ALJ's conclusion that Claimant's mental impairments were non-severe. The ALJ found that Claimant's depression and anxiety were non-severe impairments because they singly or in combination did not cause more than minimal limitation in her ability to perform basic mental work activities. (Tr. at 25). The ALJ noted that Claimant relied exclusively on her primary care providers for routine medication management until recently before the ALJ's decision. (*Id.*). Further, the ALJ discussed that Claimant was treated conservatively, taking the same dosage of Cymbalta for many years, and her mental status was intact during many office visits. (*Id.*).

The ALJ correctly evaluated the effects of Claimant's anxiety and depression using the four broad functional areas designated as paragraph "B" criteria. The ALJ found that Claimant had mild limitation in activities of daily living, noting that Claimant complained of some difficulties with personal care, but largely attributed the issues to physical problems. (Tr. at 26). Claimant cared for an adolescent son, used a calendar and system for management of personal finances, and performed numerous daily activities such as taking her son to the bus stop, watching television, performing household chores, preparing simple meals, using the computer, reading and playing games on her phone daily, sitting on the porch, running errands, and corresponding with others on the phone or computer. (Tr. at 26).

The ALJ likewise found that Claimant was mildly limited in terms of social functioning. (*Id.*). The ALJ noted that Claimant alleged that she did not want to be around

people as much as in the past, but her treatment notes did not document any consistent social deficits. Rather, Claimant presented as well nourished and developed, appropriately groomed, and in no acute distress. (*Id.*). The ALJ acknowledged that during her mental consultative examination, Claimant appeared dysphoric with a restricted affect. (*Id.*). However, she was adequately groomed, pleasant, and cooperative; her speech, thought processes and content, and social functioning were normal; and she offered adequate insight and eye contact. (*Id.*).

Next, the ALJ assessed the functional area of concentration, persistence, or pace and again found that Claimant only suffered mild limitation. (*Id.*). The ALJ noted that Claimant's concentration was mildly deficient during her consultative examination, her pace was "somewhat slow," and her persistence was fair. (*Id.*). In her records, Claimant often presented as fully oriented with grossly normal memory and intellectual functioning. (*Id.*). Furthermore, during a recent neurological examination, Claimant's higher mental function was intact, with normal language attention, and registration and recall of 3 out of 3. (*Id.*). In addition, the ALJ referenced Claimant's daily activities of watching television, using a computer, playing games, and managing her finances to support his assessment that Claimant was only mildly limited in this functional area. (*Id.*). Finally, the ALJ found that Claimant did not have episodes of decompensation of extended duration. (Tr. at 26-27).

As noted, notwithstanding the ALJ's finding that Claimant's depression and anxiety were not severe impairments, the ALJ considered the functional effects of such impairment in the RFC analysis and determined that they did not impose any restrictions on Claimant's ability to work. The ALJ discussed Claimant's alleged memory issues and other symptoms. (Tr. at 30, 32). The ALJ also acknowledged Claimant's diagnoses of

depression and anxiety and treatment by Cymbalta, (Tr. at 32, 34, 36). However, the ALJ also cited that Claimant denied having any anxiety or depression at some visits and was repeatedly observed as being in no acute distress, fully oriented, and having a normal appearance, mood, affect, speech, and memory with good judgment. (Tr. at 33-35, 40-41). The ALJ discussed in depth Claimant's September 2013 mental consultative examination and her initial psychiatric evaluation at Southern Highlands in October 2015. (Tr. at 38). Further, the ALJ explained that state agency psychologist found insufficient evidence in February 2013 to assess the limiting effects of Claimant's psychological impairments, and a second state agency psychologist opined in September 2013 that Claimant's mental impairments were non-severe and imposed only mild restrictions. The ALJ gave significant weight to this opinion. (Tr. at 42, 43, 45). Contrary to Claimant's suggestion, the ALJ acknowledged evidence that was in conflict with his findings, such as the fact that Claimant appeared in mild distress in June 2014. (Tr. at 40). However, the ALJ found that Claimant's limited and conservative mental health treatment by her regular providers, her reported daily activities, and numerous normal mental status examinations, established that Claimant's mental impairments were non-severe and did not warrant any restrictions in her RFC. (Tr. at 46).

The ALJ's analysis of Claimant's mental impairments is supported by substantial evidence. Claimant reported severe depression in October 2011, but noted that it occurred over the prior two months since she ran out of Cymbalta and explained that she was under a great deal of stress due to the sudden death of her brother. (Tr. at 718). At her follow-up visit with the same primary care provider in January 2012, Claimant denied depression or anxiety. (Tr. at 722). Indeed, throughout Claimant's records, Claimant alternated between reporting depression and anxiety and denying such symptoms. (Tr. at 699, 726,

846, 857, 880, 1342). Claimant very consistently attended her doctor's appointments and appeared to be in no distress, with normal appearance, speech, and interaction, and normal mental status examinations. (Tr. at 720, 844, 847, 853, 858, 875, 878, 1157-58, 1342). As the ALJ acknowledged, Claimant appeared to be in mild distress at her visit in June 2014 and was referred for a mental health evaluation in October 2015. (Tr. at 1012, 1351). However, Claimant stated at her mental health evaluation that Cymbalta helped her. (Tr. at 1351). As noted by the ALJ, Claimant never received any specialized mental health treatment and was treated conservatively by her regular providers for her depression and anxiety.

Moreover, no expert opined that Claimant's mental impairments had more than a minimal effect on Claimant's ability to do work activities. At her psychological examination in August 2013, the psychologist noted that Claimant's social functioning was normal and Claimant reported a number of daily activities such as taking her son to the bus stop, watching television, preparing simple meals, occasionally washing dishes, doing laundry, straightening the house, sitting on the porch, reading, running errands, playing games on her phone, and occasionally using the computer. (Tr. at 942). The ALJ acknowledged that Claimant's recent memory was moderately deficient in that particular examination; however, the ALJ correctly concluded that the record as a whole, including the numerous treatment records denoting Claimant's grossly normal memory and intellectual functioning, her later examination by a neurologist, and her daily activities, supported no greater than mild mental functional deficits. (Tr. at 26). Notably, Claimant's recent and remote memory were normal on examination as late as September 2015. (Tr. at 1342). Further, the state agency psychologist reviewed Claimant's records in September 2013, including the results of Claimant's August 2013 consultative examination, and

found that Claimant had no more than mild functional restrictions resulting from her mental impairments. (Tr. at 179). Remarking upon Claimant's ability to get along with others, perform chores, drive, shop, and handle her personal finances, the expert opined that Claimant had the mental capacity to engage in gainful work-like activity on a sustained basis. (Tr. at 180).

Overall, the undersigned does not find any merit to Claimant's position that the ALJ failed to appreciate significant evidence contradicting his finding that her mental impairments were non-severe. (ECF No. 13 at 26). The ALJ very clearly considered the entire record and reasonably concluded that, given the weight of the evidence, Claimant's mental impairments did not impose more than a minimal effect on her ability to work. The ALJ provided a thorough and well-reasoned analysis of Claimant's mental impairments. Therefore, for the reasons stated above, the undersigned **FINDS** that the ALJ's step two analysis is supported by substantial evidence.

### B. Obesity

In her next challenge to the Commissioner's decision, Claimant argues that the ALJ's "analysis" of her obesity provides no indication of the effects of her obesity or how her obesity impacted her functional abilities. (ECF No. 13 at 27). Obesity is identified as a medically determinable impairment and generally addressed by SSR 02–1P. 2002 WL 34686281, at *1. The Ruling identifies four ways obesity may be considered in the sequential evaluation process. It may be considered in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of a listing; and whether the individual's impairments prevent her from doing her past relevant work or other work existing in significant numbers in the national

economy. *Id.* at *3. The Ruling provides that "[w]hen establishing the existence of obesity, [the SSA] will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* Therefore, "in the absence of evidence to the contrary in the case record, [the SSA] will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *Id.*

In considering obesity at step two of the sequential evaluation, "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," and "[n]either do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.* at *4. Ultimately, the SSA conducts an individualized assessment of an individual's obesity in determining whether an individual's obesity impacts his or her functioning to the degree that a finding of "severe" is appropriate. *Id.*

When evaluating obesity under the Listing at step three of the sequential evaluation, the SSA will not make assumptions "about the severity or functional effects of obesity combined with other impairments." *Id.* at *6. The SSA will not make such assumptions because "[o]besity in combination with impairment may or may not increase the severity or functional limitations of the other impairments." *Id.* Therefore, in each case, an individualized determination of a claimant's functional limitations as a result of obesity will be made based on the medical record. *Id.*

At steps four and five of the sequential evaluation, the SSA assesses the residual functional capacity of a claimant. The SSA recognizes that "[o]besity can cause limitation of function." *Id.* at *6. Specifically, as a result of obesity:

> An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance,

> stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

*Id.* The SSA must take this into consideration when completing an individualized assessment of a claimant's residual functional capacity. Ultimately, the SSA "will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations" with respect to a claimant's residual functional capacity. *Id.* at *7.

In this case, the ALJ found Claimant's obesity to be a severe impairment at step two of the sequential evaluation. (Tr. at 25). At step three of the sequential process, the ALJ cited the Ruling related to obesity and recognized the requirements of the Ruling in evaluating a claimant's obesity. (Tr. at 28). In assessing Claimant's RFC, the ALJ discussed the medical evidence at length, including Claimant's weight at various examinations, her diagnosis of obesity, and the fact that her cardiologist believed that her trace edema resulted from her obesity. (Tr. at 33-46). It is evident from the decision that the ALJ considered Claimant's obesity in deciding Claimant's RFC and understood that he was required to evaluate Claimant's obesity in light of SSR 02-1p. *See Michael v. Astrue*, No. 1:08-01189, 2010 WL 697000, at *15 (S.D.W. Va. Feb. 24, 2010) (adopting report and recommendation wherein magistrate judge recognized that references to claimant's obesity in summarizing medical evidence and at step two satisfied SSR 02-1p). Moreover, the ALJ added limitations to Claimant's RFC that could be attributable to her obesity and potential limitations that could arise from her obesity, including restricting her ability lift, carry, stand, walk, reach, crawl, climb, balance, stoop, kneel, or crouch. (Tr. at 29). Furthermore, Claimant has not pointed to any specific evidence supporting an allegation that her obesity actually causes her additional functional limitations or pain. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3rd Cir. 2005) (declining to remand

where ALJ did not consider claimant's obesity because claimant failed to specify how her obesity specifically affected her ability to work other than generally stating that it made it more difficult for her to stand, walk, and use her hands and fingers); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand where ALJ did not explicitly address claimant's obesity, claimant only speculated that his obesity affected his ability to work, and ALJ adopted limitations suggested by reviewing physicians who were aware of claimant's obesity); *Copning v. Colvin*, No. 3:14-cv-00529, Dkt. No. 14 at 56-57 (S.D.W. Va. Jan. 26, 2015) (rejecting argument that ALJ failed to properly consider claimant's obesity where claimant failed to cite evidence supporting allegation that obesity caused additional functional limitations), *report and recommendation adopted by* Dkt. No. 25 (S.D.W. Va. Mar. 30, 2015); *Michael*, 2010 WL 697000, at *15 (adopting report and recommendation wherein magistrate judge rejected claimant's argument that remand was required to consider his obesity when claimant failed to assert how his obesity contributed to his inability to work).

Claimant weighed 260 pounds at the time of her internal medical examination performed by Dr. Beard in September 2013 and she weighed 269 pounds at the time of her internal medical examination by Dr. Nutter in September 2015. (Tr. at 948, 1323). Notably, neither physician assessed any specific functional limitations related to Claimant's obesity. (Tr. at 945-50, 1321-33). Moreover, Claimant has not precisely asserted how her obesity impacts her work abilities. Without any evidence or explanation as to how Claimant's obesity affects her ability to work, her argument is unconvincing. The undersigned **FINDS** that the ALJ properly considered Claimant's obesity in accordance with applicable rules and regulations.

44

### C. Credibility

In her next challenge to the Commissioner's decision, Claimant contends that the ALJ's analysis of her credibility is deficient, because the ALJ failed to evaluate her credibility prior to the RFC analysis. (ECF No. 13 at 27-28). Further, Claimant argues that the ALJ improperly casted doubt on her credibility on the basis that Claimant was gripping a cane with her left hand at the hearing contrary to her assertion that she could not grip with that hand due to carpal tunnel syndrome and was charged with making false loans. (*Id.* at 28-29). Claimant states that it was improper to discredit her character on such grounds, because she explained that she merely had the cane draped over her left arm and but was not using it at the time. Claimant also clarified that she only needed to use it to navigate hills or steps. Additionally, Claimant states that there was no evidence that she was convicted of the false loan charges. (*Id.* at 29).

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which

could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

46

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of severity solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court

does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this matter, the ALJ correctly applied the two-step approach in assessing the reliability of Claimant's statements. The ALJ discussed Claimant's allegations, her medical treatment, and her evaluations at length. The ALJ recognized Claimant's allegations of disabling pain, inability to grip, edema, memory and concentration issues, as well as her other complaints, and weighed them against the entire record. The undersigned notes that the ALJ's discussion of Claimant's alleged symptoms, treatment, evaluations, and testing in and of itself exceeded 14 single-spaced pages. (Tr. at 30-45). The ALJ stated that after careful consideration of the evidence, Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. at 43). However, the ALJ did not find Claimant's statements as to the intensity, persistence, and limiting effects of her symptoms to be entirely credible. (*Id.*). First, the ALJ noted that Claimant's cardiac issues were stable per recent notes from her cardiologist and her cardiologist continued her on a generally conservative plan of care, including continuation of the same medications and recommended lifestyle changes. (*Id.*). Her chest pains were assessed to be musculoskeletal in nature and her trace edema was noted to be secondary to her obesity. (*Id.*). Further, Claimant's acute kidney issues were stable, and her COPD was characterized as mild and her treatment in that regard had been fairly limited. (Tr. at 43-44). The ALJ noted that Claimant's physical

examinations reflected no respiratory defects, and she repeatedly denied ongoing shortness of breath. (Tr. at 44). Moreover, the ALJ cited that while Claimant's blood glucose was elevated at times, there were no acute exacerbations, requiring emergency room visits, and no noted complications from Claimant's diabetes. (*Id.*). As to Claimant's musculoskeletal issues, Claimant's treatment was generally conservative. Claimant primarily received medication with the exception of left carpal tunnel release surgery and an aspiration and steroid injection in her right knee, both of which provided her significant relief. (*Id.*). One provider suggested lumbar epidural steroid injections as a possibility, but there was no documented follow up on this suggestion. (*Id.*). In sum, the ALJ concluded that while Claimant had severe medical issues, the documented treatment history and objective findings were not what would be expected of someone who was totally unable to work due to medical problems. (*Id.*).

Furthermore, the ALJ noted that some inconsistencies diminished Claimant's credibility. For instance, Claimant alleged that she had serious difficulty grasping objects, particularly with her left hand, and could not use a computer due to it. (*Id.*). However, Claimant stated during her consultative examination that she sometimes used the computer and played games on her smartphone, which both required greater manipulative ability than she alleged. (*Id.*). Further, the ALJ noted that Claimant brought a cane to the hearing in her left hand, but stated that she was not actually using it in that hand, and she also brought a cane to both consultative examinations, but both examiners saw no definite need for her to use it. (*Id.*). The ALJ surmised that Claimant may have attempted to portray greater limitations than she had, noting that she was also charged with a crime of dishonesty (making false loans). Claimant also reported an uneven earnings history and claimed to not know the source of her self-employment earnings in

2008. (*Id.*). The ALJ also discussed the various opinions offered in this matter, including the consultative examinations and other assessments. Notably, none of the experts opined that Claimant had work-preclusive limitations. (Tr. at 44-46).

As shown above, the ALJ provided clear reasons, supported by the record, for his assessment that Claimant's statements was not fully credible. The ALJ did not address the credibility issue in a conclusory fashion, nor the did the ALJ impermissibly find Claimant's representations to be less than fully reliable solely because there was no objective evidence to support her statements. Rather, the ALJ carefully reviewed the record and found that Claimant's treatment, testing, and examinations revealed evidence that was contrary to the symptoms and limitations which she alleged, such as the fact that Claimant was generally treated conservatively and her conditions were noted to be stable. This analysis is clearly documented in the ALJ's decision.

As to the argument that the ALJ unfairly suspected Claimant of using the cane as a prop to appear more limited, the Court is not in the position to make a *post hoc* credibility determination. Instead, the Court reviews the ALJ's finding to determine whether it is supported by more than a scintilla of evidence. In this case, Claimant was repeatedly noted to be ambulating normally, with a normal gait and station, in 2011 through 2015 except for one visit in September 2015 at which Claimant ambulated with a cane. (Tr. at 720, 844, 847, 850, 853, 858, 872, 875, 878, 1012, 1157, 1342). Yet, Claimant presented to both of her consultative examinations in September 2013 and September 2015 mildly limping and carrying a cane. (Tr. at 947-48, 1324). Both physicians stated that Claimant's gait was not unsteady or unpredictable, and they saw no need for her to require the use of an ambulatory device. (Tr. at 947, 1324, 1329). The ALJ also personally observed the Claimant with the cane in her left hand despite her statements that she was

unable to grip with that hand. (Tr. at 113). The ALJ was entitled to weigh the above evidence, including the ALJ's own personal observation of Claimant, in assessing Claimant's credibility.

As to the ALJ's statement that Claimant was once charged with making false loans, Claimant contends that this factor should not have been held against her because there is no evidence in the record that she was convicted of the charge. Nonetheless, the ALJ's statement regarding Claimant's false loans charge was accurate and was based upon information from Claimant's consultative examination. (Tr. at 941). The ALJ did not rely on information outside of the record or misstate the information. Moreover, the ALJ's decision makes clear that the ALJ found Claimant to be less than fully credible primarily because her subjective complaints were not supported by her treatment history and the objective findings. (Tr. at 44). The ALJ merely acknowledged the presence of other factors, which were probative of Claimant's credibility; such as, the charge against her for making false loans. (*Id.*). A reviewing court must "defer to the ALJ's credibility finding except in those exceptional cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Harwley v. Berryhill*, No. 6:16CV32, 2017 WL 4276833, at *7 (W.D. Va. Sept. 26, 2017) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. Appx. 65, 68 (4th Cir. 2014); see *Edeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997); *see also Shively*, 739 F.2d at 989-90.

Therefore, because the ALJ provided ample other reasons for finding Claimant not credible that are supported by the record and his statement regarding Claimant's dishonesty charge was factually accurate, the ALJ's reliance on that basis to discredit Claimant's credibility was harmless error, at most. *See, e.g., Skinner v. Berryhill*, No. CV ADC-16-3957, 2017 WL 5624950, at *13 (D. Md. Nov. 20, 2017) (holding that an ALJ did

not err in considering a claimant's drug-related conviction, which was not even a crime of moral turpitude, in discrediting the claimant's credibility because the ALJ provided ample other reasons for the credibility finding and showed that the evidence of record contradicted the claimant's subjective complaints).[2] In sum, the undersigned **FINDS** that the ALJ's credibility analysis was properly conducted in compliance with the applicable mandates, and his determination was supported by substantial evidence.

### D. Dr. Nutter's Opinion

Finally, Claimant challenges the ALJ's decision on the basis that the ALJ afforded partial weight to the opinion of Dr. Nutter, who performed a one-time consultative examination of Claimant in September 2015. (ECF No. 13 at 30-32). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his]

---

[2] Courts have applied a harmless error analysis in the context of Social Security appeals. One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). Ultimately, it is the responsibility of the ALJ, not the Court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as

these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, Dr. Nutter performed an internal medicine examination of Claimant and completed a medical source statement of ability to do work-related activities form. As relevant to Claimant's challenge, Dr. Nutter found that Claimant could sit for four hours total in a workday, stand or walk for two hours total in a work day, never kneel, and only occasionally operate a motor vehicle. (Tr. at 1329, 1331, 1332). The ALJ weighed this information and determined that the objective evidence and Claimant's overall history of treatment supported some of Dr. Nutter's conclusions. (Tr. at 44-45). However, the ALJ did not find Dr. Nutter's assessment of the above limitations to be consistent with the record. (Tr. at 45). The ALJ noted that multiple physical examinations showed a largely normal gait and no obvious need for a cane, Claimant was never prescribed an assistive device, and her straight leg raising tests were negative or only mildly positive. (*Id.*). Furthermore, the ALJ noted that Claimant's treating providers did not generally observe Claimant to have any discomfort when sitting and it was unclear what evidence informed Dr. Nutter's opinion in assessing such limitation. (*Id.*). In addition, the ALJ disagreed with Dr. Nutter's assessment that Claimant could never kneel given the relatively mild

findings regarding Claimant's musculoskeletal issues and the ALJ noted that there were multiple reports that Claimant could drive with some regularity, such as to the grocery store and doctor's appointments. (*Id.*). Therefore, the ALJ found that the record did not support any limitation with respect to driving. (*Id.*).

In this case, the ALJ provided a comprehensive review of the objective medical findings, Claimant's statements, her level of activity, and the medical source opinions. (Tr. at 30-46). The ALJ discussed the strengths and weaknesses of the opinions and explained the weight that the ALJ assigned to each of them, including the opinions of Dr. Nutter. Although the ALJ did not give great weight to all of Dr. Nutter's opinions, the ALJ was not required to do so and was free to accept some of his opinions, while rejecting others. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014 WL 671462, at *10 (D. Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D. Md. May 17, 2013)). Ultimately, the ALJ gave the most weight to medical source opinions that were consistent with and supported by the evidence as a whole. Accordingly, the ALJ complied with Social Security rulings and regulations in weighing the medical source opinions.

Significantly, regarding the ALJ's conclusion that Claimant could sit for six hours, as opposed to Dr. Nutter's assessment of four hours; stand or walk for four hours, as opposed to Dr. Nutter's assessment of two hours; and the ALJ's finding that Claimant could occasionally kneel, as opposed to Dr. Nutter's opinion that Claimant could never perform such postural activity, the undersigned notes that Claimant's musculoskeletal examinations were normal as late as September 2015. (Tr. at 1342). Claimant ambulated

normally with a normal gait and station in her numerous medical appointments in 2011 through 2015, with the exception of a single visit in September 2015 in which Claimant used a cane. (Tr. at 720, 844, 847, 850, 853, 858, 872, 875, 878, 1012, 1157, 1342). Also, Claimant's gait was not unsteady or unpredictable at either of her consultative examinations in September 2013 and 2015, and the physicians saw no need for her to use an assistive device. (Tr. at 947, 1324). Claimant appeared comfortable when seated during the examinations, and the record does not show that Claimant had any issues driving to or sitting during her frequent medical appointments. (Tr. at 948, 1324). Dr. Nutter did not provide any explanation whatsoever for his assessed limitations that Claimant could sit for only four hours, stand or walk for two hours, never kneel, and only occasionally drive. (Tr. at 1329, 1331-32). The sections of the form in which Dr. Nutter was asked to provide the medical or clinical findings that supported his assessment and explain why they supported such limitations were left entirely blank. (*Id.*).  The ALJ reviewed the record in explicit detail and clearly explained his assessment of Claimant's functional limitations. (Tr. at 30-45). Furthermore, both state agency physicians agreed that Claimant could occasionally kneel and could sit for at least four hours in a work day; in fact, such experts opined that Claimant could sit for up to six hours total. (Tr. at 158, 181). Overall, the ALJ provided substantial support for his treatment of Dr. Nutter's opinions. Accordingly, the undersigned **FINDS** that the ALJ properly weighed the opinions of consulting source, Dr. Nutter.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request

for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 17); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: March 22, 2018

Cheryl A. Eifert
United States Magistrate Judge

57